**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
————————————————

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JOSEPH P. PACHECO,

     Defendant - Appellant.

No. 16-3294

————————————————

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:13-CR-20068-CM-1)**
————————————————

Gregory C. Robinson, the Law Office of Gregory Robinson, Lansing, Kansas, appearing for the appellant.

Carrie N. Capwell, Assistant United States Attorney (Thomas E. Beall, United States Attorney with her on the brief), Kansas City, Kansas, appearing for the appellee.
————————————————

Before **BRISCOE**, **EBEL**, and **MATHESON**, Circuit Judges.
————————————————

**EBEL**, Circuit Judge.
————————————————

    In 2013, Defendant Joseph Pacheco was indicted on one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B)(viii), one count of possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), and one count of being a

felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). At trial, the jury returned a verdict of guilty on all counts, and Pacheco was sentenced to a within-guidelines term of 355 months in prison.

On appeal, Pacheco challenges several elements of his conviction and sentence. With regard to his conviction, he first argues the district court erred in denying his motion to suppress evidence gleaned from a cell phone recovered by officers at the scene of his arrest because the device was originally seized in violation of the Fourth Amendment. In the alternative, he maintains the evidence from the cell phone should have been suppressed because the warrant ultimately authorizing officers to search the phone was authorized in Kansas but executed at a computer lab in Missouri. Finally, Pacheco contends the district court abused its discretion by denying his request for a jury instruction on the lesser-included charge of simple possession.

As for his sentence, Pacheco argues the district court further abused its discretion in how it defined the amount and type of methamphetamine with which Pacheco was charged for sentencing purposes. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we AFFIRM the district court.

## I.      BACKGROUND

**A. The Arrest**

On February 4, 2014, while responding to reports of a simple disturbance between two vehicles, Officer Jacob Dent of the Kansas City, Kansas Police

Department ("KCKPD") pursued one of the vehicles through Kansas City, Kansas, only calling off the chase when the car entered a neighboring jurisdiction. After returning to headquarters, Officer Dent determined that the car was driven by the Defendant, Joseph Pacheco, and that the Kansas Department of Corrections ("KDOC") had issued a warrant for his arrest pursuant to an outstanding parole violation.

The next day Officer Dent went to the address listed on the car's registration, 3101 South 39th Street, intending to arrest Pacheco for violating the terms of his release. Upon his arrival, Dent saw the car parked in the driveway, approached the back door of the residence, knocked, and peered through the door's double glass window, observing Mr. Pacheco sitting at a computer desk. At this point Pacheco "looked straight at" Officer Dent for ten to fifteen seconds, ignored Dent's requests for Pacheco to come to the door, slowly scooted his chair back from the desk, and disappeared from view. R. Vol. II at 31.

Having determined that Pacheco was unlikely to surrender, Officer Dent retreated to his squad car and called for backup. He was joined shortly thereafter by three other members of the KCKPD and Vic Harshbarger, an officer with the KDOC. After loudly commanding anyone in the house to come out with their hands up, the officers decided to make entry. Just prior to the officers forcing their way into the residence, three men walked out the back door and surrendered to the officers. These men were later identified as John Carter, Jason Crump, and Walter Flaugher.

3

In response to the officers' questions about whether anyone else was in the house, one of the men responded that "he's in the residence, he has a gun, and . . . he said he will not go back to prison." Id. at 44. Having seen Pacheco earlier through the window Officer Dent presumed Pacheco was still in the home, although the comments did not identify him by name.

At this point the officers entered the residence and swept the house room by room in search of Pacheco. Upon arriving at the upstairs bedroom the officers noticed a mattress askew from the corresponding frame and box spring, and searched under the bed and between the mattress and the box spring "to be sure that nobody would, one, be hiding in the debris on top of the bed, and then two, wasn't trying to conceal themselves between the box springs and mattress, hiding." Id. at 52. Looking under the mattress, the officers saw a handgun, a green tube that appeared to contain several individual baggies of narcotics, and a separate baggy that also appeared to contain narcotics.

Leaving these items under the bed, the officers continued to search for Pacheco, eventually entering an unfinished attic space off the main bedroom. Seeing a bulge in the insulation along the walls in this attic, the officers peeled back the insulation and found Pacheco lying between the insulation and the exterior wall. The officers grabbed Pacheco by the arms and picked him off the floor, at which point he dropped a cell phone he had been holding in his hands. The officers then placed Pacheco in handcuffs and escorted him outside the residence and into Officer Dent's waiting patrol car.

4

**B. The Search**

Following Pacheco's arrest, the KCKDC narcotics unit sought and obtained a warrant to search the residence for evidence of narcotics activity. The warrant, issued by a Wyandotte County District Court judge, authorized the search of 3101 South 39th Street, Kansas City, Wyandotte County, Kansas for:

- Methamphetamine
- Firearms
- Drug Paraphernalia
- United States currency
- records of narcotics transactions, and documents which prove legal occupancy including, but not limited to, writings, books, checkbooks, and bank account statements, magazines, records, tax receipts, utility receipts, rent receipts, post-marked envelopes, photographs, and keys, all of which tend to show the identity of persons in ownership, dominion, or control of said premises.

R. Vol. I at 71 ("The Physical Search Warrant").

Pursuant to this warrant, members of the KCKPD narcotics unit entered the residence and seized the weapon and drug paraphernalia Officer Dent had seen underneath the upstairs mattress, as well as a collection of other drug paraphernalia including smaller quantities of drugs, a digital scale, and plastic baggies from elsewhere in the house. Lab testing revealed that the substance found underneath the upstairs mattress and elsewhere was a methamphetamine mixture. The methamphetamine mixture was later determined to be between 94% and 95% "pure" methamphetamine. After pulling DNA from the weapon found underneath the upstairs mattress, tests concluded that the three individuals who left the house prior

5

to the officers' entry could be excluded as the source of the major DNA profile pulled from the gun, but Pacheco could not.[1]

The officers executing the search warrant also recovered the phone that Pacheco dropped when he was discovered in the attic. The officers did not search the contents of the phone on the spot, but rather applied for a search warrant for the contents of the phone. The affidavit in support of that warrant application noted that retrieving the information on the phone would need to be done "by a qualified computer expert in a laboratory or other controlled environment." R. Vol. I at 118. One such environment, according to the affidavit, was the Heart of America Regional Computer Forensics Laboratory located just across the Kansas – Missouri border in Missouri. On the basis of this affidavit a Kansas state judge issued a warrant authorizing the search of Pacheco's phone for digital information, contacts, photos, messages, and records of narcotics transactions. R. Vol. I at 121 ("The Digital Search Warrant"). When the phone's contents were analyzed at the lab in Missouri, the government found photos of a book depicting a gun like the one recovered from underneath the mattress, and several text messages that arguably tied Pacheco to drug distribution.

---

[1] Testimony at trial adduced that the probability of selecting an unrelated individual at random from the population that cannot be excluded as the source of the major DNA profile would be one in 48.76 million for DNA taken from one part of the weapon, and one in 1.023 quadrillion for DNA taken from another part of the gun.

### C. The Trial

Pacheco was indicted on federal narcotics distribution and weapons charges. Prior to trial Pacheco challenged the seizure of his cell phone on the basis that the Physical Search Warrant did not specifically authorize the seizure of his electronic devices. In the alternative, Pacheco argued the district court should suppress evidence gleaned from his cell phone because the Digital Search Warrant was authorized by a Kansas judge, but executed in Missouri. The district court denied these motions.

The case then proceeded to trial. At trial the government introduced the DNA evidence and the text messages and photos from the phone, as well as the testimony of several of the officers involved in the investigation and the testimony of Jason Crump, one of the men who left the house prior to the officers entering and arresting Pacheco. Mr. Pacheco testified in his own defense, and in response the government offered the rebuttal testimony of Felix Leal, who was then serving a sentence for distribution of methamphetamine and illegal weapons possession. Leal testified that in 2012 he had sold Methamphetamine to Pacheco between eight and twelve times, in varying amounts ranging from an eight-ball (3.5 grams) to an ounce. After hearing this evidence, the jury returned a verdict of guilty on all counts.

Following the verdict, the probation office prepared a revised Presentence Investigation Report ("PSR") that took into account the officers' investigation and Leal's testimony. Pacheco objected to several components of the report, most notably that the PSR attributed to Pacheco for distribution purposes the amounts of

7

methamphetamine Leal testified as having sold to Pacheco.  The district court largely

overruled those objections, but did reduce the amount of methamphetamine attributed

to Pacheco to 154.96 grams, the lowest total supported by Leal's testimony.[2]

The PSR classified all the methamphetamine attributed to Pacheco for

sentencing purposes as "ice" methamphetamine.[3]  While the drugs found at Pacheco's

residence were confirmed to be between 94% and 95% "pure," the PSR's basis for

classifying the remaining drugs with which Pacheco was attributed as "ice" was that

Leal had sold sufficiently pure methamphetamine to two confidential informants

"close in time to when Leal reportedly supplied the defendant with

methamphetamine."  R. Vol. III at 61.  The Defendant also objected to this

classification, but the district court overruled that objection.  With a guidelines range

between 262-327 months for Counts 1 and 3, and a mandatory sixty-month sentence

to be served consecutively to any other term of imprisonment on Count 2, the court

sentenced the defendant to a within-guidelines sentence of 355 months.  The

Defendant timely appealed.

---

[2] This pyrrhic victory for Pacheco had no effect on his overall guidelines range, because reducing his total weight from 259.26 grams (the amount listed in the PSR) to 154.96 grams (the amount settled on by the court) did not adjust Pacheco's offense level under U.S.S.G. § 2D1.1(c)(4) which provides for an offense level of 32 when between 150 and 500 grams of "ice" methamphetamine is attributed to the defendant.

[3] The Sentencing Guidelines define "ice" for the purposes of the Drug Quantity Table as "a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity."  U.S.S.G. § 2D1.1 Application Note C.

## II.    DISCUSSION

On appeal Pacheco presents four issues for our review, two relating to his motions to suppress evidence recovered from his cell phone, one regarding a proposed jury instruction, and one relating to his sentence.  The Court considers each of his arguments below.

### A. The cell phone was legally seized pursuant to the totality-of-the-circumstances parolee exception to the warrant requirement.

After Pacheco's arrest, law enforcement sought and obtained a warrant to search 3101 South 39th Street for drugs, drug paraphernalia, firearms, currency, and "records of narcotics transactions."  The Physical Search Warrant.  When executing this warrant, the officers seized the cell phone Pacheco was holding when he was discovered hiding in the attic.[4]  Pacheco moved to suppress the introduction of evidence from this cell phone at the district court, and has renewed that objection on appeal, arguing that the Physical Search Warrant is insufficient to permit the search or seizure of electronic devices, and there is no applicable exception to the warrant requirement that can excuse the seizure.  The government responds that it was lawful for the officers to seize the cell phone incident to his valid arrest, or, in the alternative, pursuant to the special-needs or totality-of-the-circumstances exceptions to the warrant requirement.

---

[4] The officers also seized two computers, but because no evidence from those computers was introduced at trial, only the cell phone is relevant for the purposes of this appeal.

9

We review the ultimate decision to deny a motion to suppress based on the Fourth Amendment de novo, but will not disturb the district court's findings of fact unless they are clearly erroneous. United States v. Shuck, 713 F.3d 563, 567 (10th Cir. 2013) (citing United States v. Polly, 630 F.3d 991, 996 (10th Cir. 2011)).

### 1) The Exception for Searches Incident to Arrest

The government argues that the seizure of the phone was reasonable under the exception for searches incident to arrest. See Chimel v. California, 395 U.S. 752, 762–63 (1969). We disagree. While Pacheco was holding his cell phone when he was discovered, it was not recovered until later.

> The rule allowing *contemporaneous* searches is justified . . . by the need to seize weapons and other things which might be used to assault an officer . . . as well as by the need to prevent the destruction of evidence of the crime . . . . But these justifications are absent where a search is remote in time or place from the arrest.

Id. at 764 (emphasis added) (quoting Preston v. United States, 376 U.S. 364, 367 (1964)).

Here, the exigencies which give rise to the exception for searches incident to arrest—a concern for officer safety or the destruction of evidence—no longer applied to the phone when it was recovered because Pacheco had already been arrested and removed from the house. Therefore its seizure cannot be reasonable pursuant to the Chimel exception.

10

*2) The Special-Needs Exception for Parolees*

That conclusion does not end our inquiry. On appeal the government does not rely on the search warrant to justify the seizure of the cell phone, but rather rests the validity of the seizure on Pacheco's status as a parolee.

"[F]or searches of probationers and parolees and their homes, the Supreme Court has embraced two exceptions to the warrant and probable-cause requirements: (1) a special-needs exception and (2) a totality-of-the-circumstances exception." United States v. Warren, 566 F.3d 1211, 1215 (10th Cir. 2009). The special-needs exception applies when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." Id. (quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)). In the context of a parolee, the exception holds that "[s]upervision . . . is a 'special need' of the State . . . [that makes a] warrant requirement impracticable and justif[ies] replacement of the standard of probable cause by 'reasonable grounds.'" Griffin, 483 U.S. at 873–76. This exception does not extend to non-correctional officers "*unless they are acting under the direction of [a] parole officer.*" United States v. Freeman, 479 F.3d 743, 748 (10th Cir. 2007) (emphasis added).

Perhaps a KDOC officer such as Officer Harshbarger could have, pursuant to the special-needs exception, searched Pacheco's residence, seized potential evidence of wrongdoing, and shared that evidence with KCKPD officers. But that is not what happened. Instead, the government confirms that Harshbarger "left Pacheco's residence once KCKPD obtained a search warrant for the residence and permitted

11

KCKPD narcotics officers to collect the Samsung cell phone during their search of the home[.]" Gov't Br. at 29. Given that Harshbarger was no longer on the premises—not to mention that the officers had sought and obtained a separate search warrant—it defies reason to conclude the KCKPD officers who seized the cell phone were "acting under the direction of the parole officer." Freeman, 479 F.3d at 748.

Nor is this conclusion as formalistic as it may appear. The entire special-needs line of exceptions is predicated on the existence of "special needs, *beyond the normal need for law enforcement*, [which] make the warrant and probable-cause requirement impracticable." Griffin, 483 U.S. at 873 (emphasis added) (quoting New Jersey v. T.L.O., 469 U.S. 325 (1985)). In labeling supervised release as such a "special need," the Supreme Court reasoned that a "warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires." Griffin, 483 U.S. at 876.[5]

Here, the search of Pacheco's residence and the subsequent seizure of his cell phone were not conducted pursuant to the "special need" of parole enforcement and supervision. Not only had Harshbarger left, but the officers had already arrested Pacheco. At this point the officers seized the phone entirely for the purpose of using the information on it as evidence at Pacheco's criminal trial rather than for any

---

[5] The Court also noted that the "delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct . . . and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create." Griffin, 483 U.S. at 876 (internal citations omitted).

12

identifiable special need "beyond the normal need for law enforcement." Id. at 873; see also Chandler v. Miller, 520 U.S. 305, 314 (1997) (defining "special needs" as "concerns other than crime detection"); MacWade v. Kelly, 460 F.3d 260, 268 (2d Cir. 2006) ("[A]s a threshold matter, [a special needs] search must serve as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation.") (internal quotations and alterations omitted). Therefore the special-needs exception cannot be used to justify the phone's seizure.

*3) The Totality-of-the-Circumstances Exception*

However, Pacheco's status as a parolee is also relevant for our consideration of the totality-of-the-circumstances exception to the warrant requirement. This exception, which is predicated on general Fourth Amendment reasonableness balancing, United States v. Knights, 534 U.S. 112, 118 (2001), authorizes warrantless searches of the residences of parolees "without probable cause (or even reasonable suspicion) by police officers with no responsibility for parolees or probationers when the totality of the circumstances renders the search reasonable." Warren, 566 U.S. at 1216.

Reasonableness is the "touchstone" of the Fourth Amendment, and we determine what is or is not reasonable by weighing the degree to which a search or seizure intrudes on a suspect's reasonable expectation of privacy against the degree to which the intrusion is necessary to promote legitimate government interests. Knights, 534 U.S. at 118–19. When the search or seizure targets an individual on parole, that individual's "status as a probationer subject to a search condition informs

13

both sides of that balance." Id. at 119. On the parolee's side, when the terms of a parolee's parole allow officers to search his person or effects with something less than probable cause, the parolee's reasonable expectation of privacy is "significantly diminished." Samson v. California, 547 U.S. 843, 849-50 (2006) (citing Knights, 534 U.S. at 119–20).[6] On the government's side, "the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" Knights, 534 U.S. at 120 (quoting Griffin, 483 U.S. at 880). The state's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." Knights, 534 U.S. at 121.

In Kansas, "[p]arolees . . . are . . . subject to searches of the person and the person's effects, vehicle, residence and property by any law enforcement officer based on reasonable suspicion of the person violating conditions of parole or postrelease supervision or reasonable suspicion of criminal activity." Kan. Stat. Ann. § 22-3717(k)(1)(3).[7] By the time police seized Pacheco's cell phone, he had already

---

[6] Samson also instructs that, as a parolee, Pacheco had even "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." 547 U.S. at 850.

[7] This particular language was added to the Kansas Code after Pacheco was arrested, sentenced, and imprisoned on the initial charges for which he was on parole at the time of this search. However Pacheco was informed of the new statute on July 25, 2012, and signed a form agreeing to be bound by the new law. Furthermore, while Pacheco had already been taken into custody when the search at issue here was effectuated, we have held that "an arrest does not immediately terminate a search

14

been arrested for violating the conditions of his parole and a neutral magistrate had concluded there was probable cause to believe Pacheco's residence contained evidence of a crime. Thus on Pacheco's side of the balancing scale he had a reduced expectation of privacy given his acquiescence to the terms of § 22-3717. Meanwhile on the government's side of the scale, at the time of the search there was probable cause—let alone reasonable suspicion—to believe Pacheco had reengaged in criminal wrongdoing while on parole.

Therefore, the totality of the circumstances surrounding the search render the seizure of that phone reasonable under the Fourth Amendment in the parole context. Accordingly we AFFIRM the district court's decision to deny the motion to suppress based on the seizure of the phone.

## B. We uphold the subsequent search of Pacheco's phone in Missouri based on <u>Leon</u>'s good-faith exception to the warrant requirement.

As noted previously, "the ultimate touchstone of the Fourth Amendment is 'reasonableness[.]'" <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006). "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 653 (1995) (citing <u>Skinner v. Ry. Labor Execs'. Assn.</u>, 489 U.S. 602, 619 (1989)). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." <u>Riley v. California</u>, 134 S. Ct. 2473, 2482 (2014) (citing

provision in a parole or probation agreement." <u>United States v. Trujillo</u>, 404 F.3d 1238, 1242 (10th Cir. 2005).

15

Kentucky v. King, 563 U.S. 452, 459–63 (2011)).  One of those exceptions is the

Leon good-faith exception, under which we will decline to suppress the fruits of a

search so long as the executing officer has a good-faith belief that the warrant

authorizing the search was valid.  United States v. Leon, 468 U.S. 897 (1984).  While

we see several potential grounds for upholding the search in this instance, we

ultimately predicate our ruling on the Leon good-faith exception, concluding the

executing officers acted in reasonable reliance on the Digital Search Warrant.

*1) Background*

On February 14, nine days after KCKPD officers lawfully seized the phone

pursuant to the totality-of-the-circumstances exception to the warrant requirement,

Officer Dylan Passinesse of the KCKPD applied for a warrant from a Kansas state

judge authorizing a search of the contents of the phone, namely: "digital information,

records of narcotics transactions, Text Messages, personal contacts and

documents[.]"  R. Vol. I at 119.  Officer Passinesse, in his affidavit in support of the

warrant application, described the recovery of this information as an "exacting

scientific procedure," and indicated that doing so would require the expertise of "a

qualified computer expert in a laboratory or other controlled environment."  R. Vol. I

at 118.  Passinesse went on to inform the Kansas judge that "[o]ne such forensic and

controlled laboratory environment is the Heart of America Regional Computer

Forensics Laboratory (HARCFL), which is physically located in Clay County,

Missouri."  Id.  Later that day, the Kansas judge approved the Digital Search Warrant

without reference to where the physical search would take place.  KCKPD officers

16

then transported that phone to the HARCFL, where the phone's contents, including several incriminating photos and text messages, were downloaded.

Pacheco moved to suppress this evidence on the basis that the "issuance of a search warrant by a Kansas district judge to be executed in Missouri violated the Fourth Amendment." Aplt. Br. at 29 (citing United States v. Krueger, 809 F.3d 1109, 1124 (10th Cir. 2015) (Gorsuch, J., Concurring)); see also State v. Robinson, 363 P.3d 875 (Kan. 2015) (holding that district judges have authority to issue warrants that are "executable statewide") disapproved of on other grounds by State v. Cheever, 402 P.3d 1126 (Kan. 2017). The government responds that even if the Kansas court, as a matter of state law, did not have the power to authorize officers to download the phone's contents in Missouri, that alone does not invalidate the warrant for Fourth Amendment purposes, because the Fourth Amendment is not concerned with state jurisdictional limits of a state magistrate issuing the warrants, but only with reasonableness of the search or seizure. Gov't Br. at 34 (quoting United States v. Le, 173 F.3d 1258, 1264 (10th Cir. 1999) ("The fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.") (internal quotations omitted).[8] The district

---

[8] The government is correct that we normally assess Fourth Amendment reasonableness pursuant to federal standards. See, e.g., United States v. Jones, 701 F.3d 1300, 1309 (10th Cir. 2012). We are mindful, however, that at least one case from this circuit has suggested that the Fourth Amendment is only satisfied if officers obtain a warrant "from a magistrate of the relevant jurisdiction." United States v. Green, 178 F.3d 1099, 1106 (10th Cir. 1999). That language was not necessary to the outcome, however, because in that case the magistrate's jurisdiction was not in

17

court denied Pacheco's motion, R. Vol. I at 223, and we review that denial de novo, United States v. Caro, 248 F.3d 1240, 1243 (10th Cir. 2001).

Although we believe the issue is more nuanced than either party would suggest, we nonetheless see several grounds that credibly might support upholding the digital search of Pacheco's phone, namely 1) that the phone could have been searched absent a warrant under the totality-of-the-circumstances exception, and 2) the Digital Search Warrant was valid because the phone and Pacheco were located within the judge's jurisdiction at the time the warrant was issued. We discuss these grounds below because the first could perhaps be an alternative way to uphold the search and the second could arguably inform the Leon good faith assessment. But, regardless, we hold that suppression is inappropriate because the officers acted in good-faith reliance on the Digital Search Warrant in downloading the contents of the phone in Missouri.

---

question, so that language is not only just a single brief remark in the opinion, but it is also dicta. Id.

We are similarly mindful of then-Judge Gorsuch's concurrence in Krueger, which suggests that "a warrant issued . . . beyond the territorial jurisdiction of a magistrate's powers under positive law [is] no warrant at all." 809 F.3d at 1123 (Gorsuch, J., concurring). Putting aside the nonbinding nature of that concurrence, Krueger is readily distinguishable because there the property to be searched was a home physically located in a state outside the federal magistrate's jurisdiction at the time the warrant was issued. See Minnesota v. Carter, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring) ("[I]t is beyond dispute that the home is entitled to special protection[.]"); Fed. R. Crim. P. 41(b)(1) (defining a federal magistrate's jurisdiction); see also infra Part II.B.3. Further, the majority ruling in Krueger was based not on the Fourth Amendment, but was instead predicated on the federal magistrate statute, which is not at issue here.

*2) The Totality-of-the-Circumstances Parolee Exception*

First, it is possible that—under the circumstances presented here—the digital search of Pacheco's cell phone did not require a separate constitutional justification beyond the authorized seizure itself.  In arguing that a separate warrant to search the phone was required, Pacheco relies on the Supreme Court's recent decision in Riley v. California, but we do not find Riley controlling in the situation before us.

Riley addressed the specific problem of cell phones seized pursuant to a search incident to arrest.[9]  134 S. Ct. at 2480.  There, officers seized an arrestee's cell phone and searched its contents with no authorizing warrant.  Id.  Noting all the potential information that could be contained on a cell phone, the court "decline[d] to extend [the search incident to arrest exception] to searches of data on cell phones."  Id. at 2485.  "Before searching a cell phone seized incident to an arrest[,]" id. at 2495, the Court held, officers are required to obtain a warrant or rely on a separate exception to the warrant requirement, id. at 2494–95.  According to the Court, the search incident to arrest exception's two policy justifications—preserving evidence and protecting officers—carried little weight in the context of the digital contents of a phone that had already been seized.  Id. at 2495.

---

[9] The search incident to arrest exception to the warrant requirement allows officers to pat down a suspect during the course of a lawful arrest and conduct a limited search of items found during that pat-down in order to protect the officers and prevent the destruction of evidence.  See United States v. Robinson, 414 U.S. 218, 235 (1973).

Unlike the search incident to arrest exception, the policy justifications for the totality-of-the-circumstances parolee exception—under which we hold that KCKPD officers validly seized the phone—do not so clearly require us to treat the seizure of the phone as a separate constitutionally significant moment from the search of that phone's digital contents. See Id. at 2494 ("[E]ven though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone."). It seems likely that, pursuant to the parolee totality-of-the-circumstances exception, KCKPD officers could have searched the entirety of Pacheco's home so long as they had reasonable suspicion of criminality. See Knights, 534 U.S. at 121 ("We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house."). Given so, there is little reason to believe they did not possess the same authority to search the digital contents of Pacheco's phone.[10] In fact, in United States v. Tucker, this Court held that, pursuant to the totality-of-the-circumstances parolee exception, a law enforcement officer could run "software" on a

---

[10] In support of its holding in Riley, the Supreme Court noted that the search incident to arrest exception had traditionally been justified because "it is a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." 134 S. Ct. at 2490–91 (internal quotations omitted). Cell phones destroyed that distinction, according to the Court, which is why the exception was no longer justified in that context. Id. at 2491. In fact in Chimel v. California, the Supreme Court held that officers could not search an arrestee's entire house pursuant to the search incident to arrest exception, even when the arrest occurred within the residence. 395 U.S. 752, 763 (1969). This is the critical difference between the scope of the totality-of-the-circumstances parolee exception and the search incident to arrest exception, because the entire home of a parolee can be searched with reasonable suspicion pursuant to the totality-of-the-circumstances exception. Knights, 534 U.S. at 121.

20

parolee's computer, examine the computer's browser history, and run "another program that allowed him to view deleted files[.]"  305 F.3d 1193, 1196–97, 1201–01 (10th Cir. 2002).[11]

### 3) The Judge Who Issued This Search Warrant Clearly Had Jurisdiction over the Phone and the Defendant When that Warrant Was Issued

Additionally, we might be able to uphold execution of the search warrant here because even if the execution of the warrant technically occurred in Missouri, the issuing judge clearly had jurisdiction over both the phone and Pacheco in Kansas at the time he issued the warrant.  By contrast, in Krueger,[12] on which Pacheco relies, the real estate property in question was located outside the magistrate's jurisdiction even when the warrant was signed.  809 F.3d at 1111.  Then-Judge Gorsuch's concurrence considered that case through a lens of judicial power, id. at 1122–23

---

[11] It may also be possible to read Riley for the basic proposition that police are ordinarily required to obtain at least some judicial warrant before downloading the digital contents of a cell phone.  If so, in any event, that is exactly what happened here.  A magistrate issued a specific search warrant to search the contents of this cell phone based on an application that described the items to be sought in the search. See R. Vol. I at 117–21.  Thus, if the warrant requirement imposed in this interpretation of Riley applied here, it was fully satisfied.

[12] Krueger considered whether a warrant issued by a magistrate to be executed outside of the magistrate's statutory territory was valid under the Fourth Amendment. 809 F.3d at 1109–10.  The majority there held that the warrant in question did exceed the magistrate's authority under Fed. R. Crim. P. 41(b), but considered whether to suppress the fruits of that warrant under the framework supplied by United States v. Pennington, 635 F.2d 1387 (10th Cir. 1980).  The majority ultimately concluded that, under Pennington, Krueger had established prejudice from the violation of Rule 41 and affirmed the district court's decision to grant Krueger's motion to suppress. Id. at 1117–18.  Unlike the concurrence, the majority did not address whether "an outside-of-district warrant issued by a federal magistrate judge who lacks authority to do so under Rule 41 violates the Fourth Amendment."  Krueger, at 1114.

21

(Gorsuch, J. concurring), ultimately concluding that because the real estate was located outside the magistrate's territorial limitations, the magistrate lacked the "power to adjudicate" with regards to that property.  Id. at 1122.  Here, both Pacheco and the phone were located in Kansas—within the court's jurisdiction and power—when the state judge signed the warrant.[13]  It could be argued, then, that the Judge therefore had judicial power over both Pacheco and the phone, and that Pacheco's challenge to the warrant was not so much with its jurisdiction, but, more accurately, with its scope.[14]  And assessing the warrant's scope using federal law, see United States v. Jones, 701 F.3d 1300, 1309 (10th Cir. 2012), nothing about the scope of the warrant offends federal constitutional principles.

### 4)  The Leon Good-Faith Exception to the Warrant Requirement

We need not ultimately rely definitively on either of these grounds because it is clear to us that, at minimum, the motion to suppress should be denied on the basis of the Leon good-faith exception to the warrant requirement.  Under Leon, when law enforcement officers act in "objectively reasonable reliance" on a search warrant

[13] The government has said both before this Court and the district court that the phone was located in Kansas when the warrant was signed, R. Vol. I at 194, Gov't. Br. at 36, and the Defendant has not suggested otherwise.

[14] While not directly relevant here, we find it persuasive for Fourth Amendment purposes that federal magistrate judges have "authority to issue a warrant for a person or property outside [their assigned] district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed[.]"  Fed. R. Crim. P. 41(b)(2).  Factually that is what happened here.  Under such circumstances, if it is constitutional for a federal magistrate's warrant to be extended out of state, we fail to see why it should not similarly be constitutional—at least under the United States Constitution—to allow a state court's warrant to be executed out of state under similar circumstances.

22

issued by a magistrate, the exclusionary rule will not be applied to suppress the evidence obtained. United States v. Russian, 848 F.3d 1239, 1246 (10th Cir. 2017). The rationale behind the exception is that when an officer acts in good-faith reliance on a search warrant, the deterrence rationale of the exclusionary rule is no longer applicable. Id. Therefore, when a search is conducted pursuant to a magistrate's warrant, it is only when an officer's reliance on that warrant is "*wholly unwarranted*" that good faith is absent, and the evidence acquired should be suppressed. United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009) (emphasis in original) (internal quotations omitted).

Here, despite any potential constitutional infirmities that may have arisen from downloading the phone's contents out of state, not only was the warrant authorized by a duly sworn judge, but the affidavit presented to that judge explicitly mentioned that the contents were likely to be accessed in Missouri. R. Vol. I at 117–119; see also Russian, 848 F.3d at 1246 ("Although a warrant application or affidavit cannot save a warrant from facial invalidity, it can support a finding of good faith[.]").[15] In this context, it seems to us there is little deterrence rationale in excluding evidence obtained as a result of the digital search purportedly authorized by this warrant.

---

[15] This sentence in Russian continues: " . . . particularly where, as here, the officer who prepared the application or affidavit also executed the search." 848 F.3d at 1246. Here, the officer who swore the affidavit was not the officer who deposited the phone at the HARCFL and later retrieved the contents. R. Vol. I at 120. However, we believe the word "particularly" does some work in this sentence, allowing courts still to consider the affidavit even when the affiant and the executing officer are not one and the same.

23

In his reply brief, Pacheco's sole argument for why the good-faith exception should not preclude suppression in this case is that the <u>Leon</u> exception does not apply to a warrant that is void on the basis of having exceeded the issuing judge's authority. Reply Br. at 5–6 (citing <u>United States v. Workman</u>, 205 F. Supp. 3d 1256, 1267 (D. Colo. 2016) (declining to apply the <u>Leon</u> exception to a warrant issued by a federal magistrate outside of his authority under Fed. R. Crim. P. 41(b)). After Pacheco's Reply was submitted, however, the Tenth Circuit reversed the district court in <u>Workman</u>, holding explicitly that even if a court concludes "that the warrant [ ] exceed[s] geographical constraints[,]" it is still required to consider the applicability of the <u>Leon</u> exception. <u>United States v. Workman</u>, 863 F.3d 1313, 1319 (10th Cir. 2017) <u>petition for cert. filed</u>, (Dec. 12, 2017) (No. 17-7042).

Viewing the Digital Search Warrant from the perspective of a "reasonable officer," <u>Russian</u>, 848 F.3d at 1248, we note that officers routinely ship seized drugs, guns, and other physical evidence outside of a jurisdiction to be analyzed without constitutional problems. Given this frequent and unobjectionable treatment of other physical evidence, we can see how reasonable officers would assume a phone that has already been lawfully seized, and whose search has been authorized by a valid judicial warrant pursuant to an affidavit clearly disclosing the likelihood of a search of the device by experts in a different jurisdiction, may be shipped across jurisdictional boundaries so that its contents can be analyzed. Within the framework of the <u>Leon</u> exception, we cannot say that it was "wholly unwarranted" for the

24

KCKPD officers to have relied on this search warrant to authorize the search of Pacheco's phone in Missouri. See Harrison, 566 F.3d at 1256.

Again, our decision should not be read to suggest that the good-faith exception is the only possible grounds for upholding the search of Pacheco's phone. Regardless of what other tributaries of Fourth Amendment doctrine may justify the search, however, we hold that it was objectively reasonable for law enforcement officers to rely on the Digital Search Warrant to search the phone under the circumstances presented in this case. Accordingly, we AFFIRM the district court's decision to deny the motion to suppress the digital information recovered from Pacheco's cell phone.

## C. The district court did not abuse its discretion in denying Pacheco's request for an instruction on the lesser included offense of simple possession.

Prior to the case being submitted to the jury, Pacheco asked the district court to instruct the jury on the lesser included charge of simple possession in addition to possession with intent to distribute. The government challenged the instruction, arguing that "there's no evidence before this jury that the methamphetamine . . . upstairs with the gun could be anything other than a distribution amount." R. Vol. II at 1814. The district court declined to include the instruction, concluding that the only "possession defendant admitted to was not on or about the date charged." Id. at 1818.

Because the district court's decision was based on a lack of evidence tending to support the lesser included offense instruction, we review that decision for an

25

abuse of discretion. United States v. Humphrey, 208 F.3d 1190, 1206 (10th Cir. 2000), abrogated on other grounds by Arizona v. Gant, 556 U.S. 332 (2009). "An abuse of discretion is defined in this circuit as judicial action which is arbitrary, capricious, or whimsical. . . . Other evidence of such abuse would include manifestly unreasonable judgment, prejudice, bias or ill will which is ascertainable from the record." Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990).

It is well-established that a defendant "is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Beck v. Alabama, 447 U.S. 625, 635 (1980). This entitlement recognizes that where "one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." Keeble v. United States, 412 U.S. 205, 212–13 (1973). Failure to offer a legitimate lesser included offense instruction, then, "withdraws from the jury a measure of defense to which the defendant is entitled." United States v. Burns, 624 F.2d 95, 103 (10th Cir. 1980) (quoting Larson v. United States, 296, F.2d 80, 81 (10th Cir. 1961)). Therefore, "if there is evidence to support a lesser included offense and defendant requests such a charge, the court has no discretion to refuse to give the instruction." United States v. Bruce, 458 F.3d 1157, 1162 (10th Cir. 2006) (quoting Humphrey, 208 F.3d at 1207).

Under this standard, a lesser included offense instruction is warranted when:

1) There is a proper request for an instruction;
2) The elements of the lesser offense are a subset of the elements of the greater offense;

26

3) The element differentiating the two offenses is in dispute, and;

4) The jury is able to rationally acquit the defendant of the greater offense and convict on the lesser offense.

United States v. Duran, 127 F.3d 911, 914–15 (10th Cir. 1997).  The dispute on appeal here centers on the third and fourth requirements.  Pacheco argues that a jury could rationally conclude he possessed the methamphetamine in the upstairs bedroom—the drugs relevant to Count 1 of the indictment—for personal use rather than for distribution.  The government responds that "the evidence makes clear that there was no dispute concerning whether the . . . methamphetamine found under the mattress was for distribution versus simple possession."  Gov't Br. at 47.

Standing alone, Pacheco's decision to renounce at trial any knowledge of the methamphetamine found in the upstairs bedroom does not itself automatically preclude Pacheco from seeking a lesser included offense instruction on possession.  But it was a powerful piece of evidence tending to negate any evidentiary support for such an instruction.[16]  We have previously said that a defendant "is entitled to instructions on *any* defense, *including inconsistent ones*, that find support in the evidence and the law[.]"  United States v. Abeyta, 27 F.3d 470, 475 (10th Cir. 1994) (second emphasis added).  But there still must be evidentiary support for such an instruction.

---

[16] Pacheco was in a tough spot.  On cross-examination he had expressed the opinion that the same person must have put the gun and the drugs underneath the mattress.  R. Vol. II at 1613.  If he admitted to possessing the methamphetamine for personal use, then, he was implicitly admitting guilt as to the two weapons charges as well.  Thus, at trial, Pacheco renounced any knowledge of the methamphetamine found under the bed in the upstairs bedroom.

27

In this case, however, separate and apart from Pacheco's testimony that he had no knowledge of these drugs, there is simply no evidence that can sustain the conclusion that the relevant drugs under the upstairs mattress were intended by Pacheco for personal use rather than distribution. The methamphetamine found under the upstairs mattress totaled either 26.01 grams or 32.46 grams[17], but was divided into smaller baggies. An undercover police officer who testified at trial indicated that based on the amount of drugs, the packaging, and the lack of a pipe or lighter found near the drugs, he "would find it hard to believe" that this methamphetamine was intended for personal use. R. Vol. II at 862. Felix Leal, the drug dealer who testified at trial, agreed that an ounce (twenty-eight grams) "is not an amount an end user of meth is going to buy." R. Vol. II at 1727. All relevant factors—amount, packaging, and physical evidence—all militate in favor of distribution rather than simple possession.

Pacheco's own testimony only bolsters this conclusion. Pacheco admitted to being a user of methamphetamine, but contended he had never purchased a full ounce at one time. Furthermore, he repeatedly denied any knowledge of the methamphetamine under the mattress. See, e.g., R. Vol. II at 244, 310–12, 315–17, 320, 391. Pacheco's litigation strategy not to present evidence of simple possession meant that the case was submitted to the jury without *any* evidence tending to support

---

[17] See *infra* note 19.

the argument that the methamphetamine found under the upstairs mattress was intended for simple possession.[18]

We may only reverse the district court's denial of this instruction if we are "convinced" a rational jury could convict on the lesser charge and acquit on the greater charge. United States v. Moore, 108 F.3d 270, 272 (10th Cir. 1997). Given the total lack of evidence in the record which would tend to suggest the relevant methamphetamine was intended for personal use, we cannot say the denial of a use instruction was "arbitrary," "capricious," "whimsical," or "manifestly unreasonable." See Pelican Prod. Corp., 893 F.2d at 1146. The trial court "is in a unique position to determine whether" sufficient evidence exists to support a lesser included offense instruction, United States v. Scalf, 708 F.2d 1540, 1546 (10th Cir. 1983), and in recognition of this principle we defer to the district court's valid exercise of its discretion. Accordingly we AFFIRM the denial of defendant's request for the instruction.

---

[18] Pacheco argues this is not the case because: 1) Leal testified that sometimes users would pool money to buy drugs, which could explain the amount, 2) Pacheco's comment that the gun and drugs belonged to the same person could have led a jury who believed he possessed the gun to believe also that he possessed the drugs, and 3) Pacheco admitted to being a drug user but not a drug distributor, so if the jury decided the drugs were his, they had evidence in the record that he was using them rather than distributing them. This evidence is insufficient to support a "theory of defense" based on simple possession, because even if Pacheco was a user, his personal use was never related to these particular drugs. See United States v. Moore, 108 F.3d 270, 273 (10th Cir. 1997) (upholding denial of lesser included offense instruction because evidence did not support the "theory" of simple possession "even if the jury simply believed the testimony of some witnesses and disbelieved the testimony of others"). There is no evidentiary support that just because the Defendant was a drug user that he could not also possess drugs for distribution.

29

**D. The district court did not abuse its discretion in determining that the drugs attributed to Pacheco for sentencing purposes were 154.96 grams of ice methamphetamine.**

After the jury convicted Pacheco on all counts, the district court proceeded to sentencing. For sentencing purposes, the district court first attributed to Pacheco the 32.46 grams of "ice" methamphetamine discovered in the upstairs bedroom, and the defendant does not challenge this amount.[19]

The Defendant does, however, object to the district court's decision to attribute an additional 122.55 grams of "ice" to Pacheco based on the testimony of Felix Leal.

At trial, Leal testified that he had sold Pacheco drugs "probably 8 to 12 times" during 2012, R. Vol. II at 1729, and that of those times he sold Pacheco an ounce (twenty-eight grams) "three to four times," an "8-ball" (3.5 grams) "three, four

---

[19] Our review of the record uncovers an apparent discrepancy as to this amount. While the trial testimony seemingly established a total weight of 26.01 grams of methamphetamine found underneath the upstairs mattress and 6.36 grams found downstairs, see, e.g., R. Vol. II at 1055, the PSR nonetheless posited that the officers found underneath the upstairs mattress "a baggie that was found to contain 26.1 net grams of a methamphetamine mixture . . . . [And] a green tube that contained two plastic baggies [with] 6.36 net grams of methamphetamine." R. Vol. III at 58. This discrepancy could have had an impact on sentencing because the district court and the parties apparently intended only to include in their calculation the drugs found upstairs. See, e.g., R. Vol. II at 1868; R. Vol. III at 94. Furthermore, the difference between being attributed with 26.1 grams upstairs rather than 32.46 grams, when added to the 122.55 additional grams found by the district court based on Leal's testimony of other drug sales to Pacheco, represents a two-level change for Pacheco's base offense level, potentially lowering his guidelines range from 262–327 months to 210–262 months. See, U.S.S.G. § 2D1.1(c) ("The Drug Quantity Table"). Because defense counsel did not object to the attribution of these 6.36 grams, and does not assert this discrepancy on appeal, we will accept the district court's calculation as to the total amount found underneath the upstairs mattress.

30

times," and a half-ounce (fourteen grams) a "couple of times." R. Vol. II at 1731–35. Based on an interview with Leal, the PSR originally attributed 259.26 grams to Pacheco (32.46 from the house and 226.8 based on Leal's unsworn estimates). Further, on the basis of "the high purity of the methamphetamine found in the upstairs bedroom, as well as the high purity of methamphetamine of two documented sales by Felix Leal to a CI close in time to when Leal reportedly supplied the defendant with methamphetamine[,]" the PSR concluded that all of the methamphetamine attributable to Pacheco qualified as "ice." R. Vol. III at 60–61.

The Defendant objected to both the total weight of drugs attributed to Pacheco under the PSR and the classification of those drugs as "ice." Pacheco's objections were primarily due to the "inconsistencies in [Leal's] testimony," namely the differences between his testimony at trial and the information he supplied to the probation officer for inclusion in the PSR. R. Vol. III at 92–93.

The district court granted the Defendant's objection in part, choosing to rely on Leal's "credible" testimony at trial rather than his unsworn interview with the probation officer. R. Vol. II at 1868. The parties agreed that Leal's trial testimony established that Leal had sold between 122.5 and 154 grams of methamphetamine to Pacheco, and so the court added the low end of this range, 122.5 grams, to the methamphetamine the PSR indicated was found upstairs, 32.46 grams, to reach the total weight of 154.96 grams, noting that this was a "conservative estimate based on the testimony at trial." R. Vol. II at 1868–69. The court also found that there was

31

"sufficient evidence presented at trial that Mr. Leal sold, quote, ice, quote, meth to defendant." R. Vol. II at 1869.

On appeal Pacheco challenges the district court's decision to include the amounts Leal allegedly sold Pacheco in determining the total weight with which he should be attributed, and in the alternative the decision to classify any methamphetamine not recovered from the residence as "ice" for sentencing purposes. We review the district court's calculation of the amount of drugs attributable to a defendant for clear error, only reversing if the amount is "without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." United States v. Patterson, 713 F.3d 1237, 1249 (10th Cir. 2013) (quoting United States v. Ryan, 236 F.3d 1268, 1273 (10th Cir. 2001)).

"The government bears the burden of proving by a preponderance of the evidence the amount of drugs attributable to a defendant for sentencing purposes." United States v. Moore, 130 F.3d 1414, 1416 (10th Cir. 1997). According to the sentencing guidelines:

> [w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, *similar transactions in controlled substances by the defendant*, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.1 cmt. 5 (emphasis added). In making its calculations, "the trial court may rely upon an estimate . . . so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of

32

reliability." United States v. Dalton, 409 F.3d 1247, 1251 (10th Cir. 2005) (internal

quotation marks omitted) (quoting United States v. Ruiz-Castro, 92 F.3d 1519, 1534

(10th Cir. 1996)).

Granted, there were inconsistencies between Leal's testimony at trial and what

he told the probation officer.[20] Dalton, 409 F.3d at 1251.  Yet the district court,

which had the benefit of hearing Leal's testimony first-hand, "found Mr. Leal's

testimony at trial credible, and defendant's testimony not credible," and therefore

declined the defendant's invitation to "disregard Mr. Leal's testimony."  R. Vol. II at

1868.  As a court of appellate review we rightly "defer to the district court when

reviewing the credibility of the witness on whose testimony it relies in making its

factual findings."  United States v. Nieto, 60 F.3d 1464, 1469–70 (10th Cir. 1995).

On this principle it would be a stretch for us to be left with any conviction, let alone

the "definite and firm conviction" required under the abuse of discretion standard,

that a mistake has been made.

Therefore we AFFIRM the district court's decision to deny Pacheco's

objection to his sentence and attribute to Pacheco 122.5 grams of ice

methamphetamine Leal allegedly sold Pacheco in 2012.[21]

---

[20] During an interview with the probation officer, Leal told investigators that he sold
a total of 226.8 grams of methamphetamine to Pacheco over the course of fifteen
separate interactions.  R. Vol. III at 59.  At trial, however, he significantly hedged on
these numbers, indicating that he had sold Pacheco methamphetamine "several
times," eventually settling on "probably 8 to 12 times or so."  R. Vol. II at 1729.

[21] We also affirm the district court's decision to include the eight-ball amounts
allegedly sold to Pacheco by Leal.  While Leal did testify that an eight-ball is

## III.    CONCLUSION

Based on the foregoing analysis, we AFFIRM in full the district court's

judgment and sentence.

---

generally a user amount, R. Vol. II at 1754, he also indicated that an eight-ball could
be redistributed.  R. Vol. II at 1723.  Therefore we defer to the district court's
discretion to include these amounts in its total calculation.