**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 10, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KANDACE SITTING EAGLE, a/k/a
Kandace Van Fleet,

    Defendant - Appellant.

No. 24-8068
(D.C. No. 2:24-CR-00003-ABJ-2)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **FEDERICO**, Circuit Judges.
_____

In 2023, Defendant–Appellant Kandace Sitting Eagle was charged with assaulting and abusing her thirteen-year-old child, MV.[1] After a three-day trial, a federal jury convicted Ms. Sitting Eagle of one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153, 113(a)(6), and 3559(f)(3); one count of assault with a dangerous weapon in violation of 18 U.S.C. §§ 1153 and 113(a)(3);

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rules of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[1] "MV" is a pseudonym that stands for "minor victim."

and one count of aggravated child abuse in violation of 18 U.S.C. §§ 2 and 1153 and Wyoming Statutes §§ 6-2-503(b), (c), and 14-3-202(a)(i), (ii).

On appeal, Ms. Sitting Eagle first argues that the district court reversibly erred by denying her request to instruct the jury on the lesser included offense of simple assault for the charged offenses of assault resulting in serious bodily injury and assault with a dangerous weapon. Next, she argues that the cumulative effect of numerous alleged errors made by the district court and the Government during her trial violated her constitutional rights. Specifically, she asserts that the combined effect of the following alleged errors deprived her of a fair trial: (1) the district court's erroneous grant of the Government's motion in limine to exclude evidence of MV's prior bad acts, (2) the district court's erroneous sustaining of several of the Government's objections to Ms. Sitting Eagle's testimony, and (3) the Government's improper questioning of the defense witnesses on cross-examination.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3231, we affirm the district court.

## I.    BACKGROUND[2]

### A.    *The Investigation*

In the fall of 2023, thirteen-year-old MV lived in a double-wide trailer on the Wind River Indian Reservation in Wyoming with his biological mother, Ms. Sitting

---

[2] All facts are drawn from evidence presented at Ms. Sitting Eagle's trial. Where there is conflicting testimony, we "recite the facts based on the evidence most

Eagle; his stepfather, Truman Sitting Eagle;[3] and MV's five half-siblings. Toward the end of October 2023, MV was suspended from school for one week. After his suspension was over, he did not return to school. On November 1, a school employee named Skyla Jarvis contacted Ms. Sitting Eagle via telephone to check on MV. Ms. Jarvis informed Ms. Sitting Eagle that MV was "considered a dropout" because he had missed ten days of school. ROA Vol. III at 228–29. Ms. Sitting Eagle responded that she was "trying to transfer him out of school anyways." *Id.* at 229. After the phone call, Ms. Jarvis asked the School Resource Officer, Matt Lee, to conduct a welfare check on MV.

A day later, on November 2, 2023, Officer Lee performed a welfare check at MV's residence. Officer Lee knocked on the door, and Truman came out and spoke with him. Officer Lee asked "how everything was going" with MV and whether there was anything he could do to get MV back in school. *Id.* at 238. Truman initially accused Officer Lee of trespassing, but he eventually retrieved MV from inside the house. MV came outside and told Officer Lee that he was okay, and Officer Lee did not see any signs of injury on MV. Officer Lee then left the residence.

On December 12, 2023, Officer Lee returned for a second welfare check after receiving information that MV had been "staying outside" and that there had been a

---

favorable to the jury's verdict." *See United States v. Walker*, 74 F.4th 1163, 1174 n.1 (10th Cir. 2023).

[3] To avoid confusion, we refer to Truman Sitting Eagle by his first name.

"child abuse report." *Id.* at 239–40. Once again, Truman answered the door. When Officer Lee informed Truman that he was there to check on MV, Truman told Officer Lee that MV was with Ms. Sitting Eagle "at the clinic." *Id.* at 240. Officer Lee left, but he told Truman he would return later that day.

When Officer Lee returned to the residence, he saw a silver vehicle parked in front of the house, which was not there earlier. A woman then exited the residence, got into the vehicle, and drove away. Suspecting that the woman driving the car was Ms. Sitting Eagle, Officer Lee followed the car and stopped it about a mile from the residence. After identifying the driver as Ms. Sitting Eagle, Officer Lee asked where MV was. Ms. Sitting Eagle said MV "was with Clinton Monroe." *Id.* at 245. About a minute later, when another law enforcement officer arrived, Officer Lee again inquired as to MV's location. Ms. Sitting Eagle said MV was with "Jesse Monroe." *Id.* at 246. At that point, the other officer left to speak with Truman at the residence. Ms. Sitting Eagle, still sitting in the driver's seat of her vehicle, pulled out her phone, called someone and said, "The cops are coming over." *Id.* Ms. Sitting Eagle then started texting rapidly. Unprompted, she said, "He's beat up; he's got two black eyes" and "the kids down the street beat him up." *Id.* at 247. Officer Lee placed Ms. Sitting Eagle in the back seat of a patrol vehicle and then returned to the residence.

When Officer Lee arrived at the residence, he spoke to Truman. Truman told Officer Lee that MV was not home. Truman then called someone on his cell phone and said, "Cops are over here; I need help." *Id.* at 248. Officer Lee placed Truman in

4

handcuffs, and Truman said, "Okay I'll show you where his body's at." *Id.* Truman led Officer Lee outside to the side of the residence and said, "You can come out now." *Id.* at 249. Officer Lee could hear a child crying underneath the house, and he told the child that it was okay to come out. The child said "he wouldn't come out unless his dad told him he could come out." *Id.* Truman stated, "It's okay. You can come out now, [s]on." *Id.* The child then crawled out from underneath the home, and Officer Lee recognized him as MV. MV "hugged [Truman] real tight." *Id.* at 250. He was crying and "[v]isibly shaken." *Id.* Truman said to MV, "Remember–remember that those boys beat you up down the street." *Id.*

Officer Lee observed that MV had two black eyes and appeared to have "been assaulted" and "beat up." *Id.* MV "could barely walk when he got out" from underneath the house. *Id.* He "was very skinny and gaunt" and "his voice was raspy; he could hardly talk." *Id.* His eyes "were sunken in" and swollen," and his "forehead was black." *Id.* The officers at the scene detained Truman and called an ambulance for MV. MV was taken to a medical facility in Wyoming, and he was later transferred to Primary Children's Hospital in Salt Lake City, Utah.

### B.    The Indictment

On December 14, 2023, the Government charged Ms. Sitting Eagle and Truman by complaint for assaulting and abusing MV. On January 10, 2024, the Government filed an indictment charging Ms. Sitting Eagle with four crimes against MV for conduct that occurred between approximately November 1, 2023, through December 12, 2023: assault resulting in serious bodily injury in violation of 18

5

U.S.C. §§ 1153, 113(a)(6), and 3559(f)(3) ("Count Two"); assault with a dangerous weapon in violation of 18 U.S.C. §§ 1153 and 113(a)(3) ("Count Four"); kidnapping a child for the purpose of abusing the child in violation of 18 U.S.C. §§ 1153, 2, 1201(a)(2), and 3559(f)(2) ("Count Five"); and aggravated child abuse in violation of 18 U.S.C. §§ 2 and 1153 and Wyoming Statutes §§ 6-2-503(b), (c), and 14-3-202(a)(i), (ii) ("Count Six"). The Government brought identical charges against Truman. After discovering that it erred by charging Ms. Sitting Eagle with Count Five of the indictment (kidnapping) because 18 U.S.C. § 1201 does not apply to parents, the Government moved for leave to dismiss the count, and the district court granted the motion. The Government proceeded to trial against Ms. Sitting Eagle on Counts Two, Four, and Six.

### C.    The Motion in Limine

Before trial, the Government filed several motions in limine including, as relevant to this appeal, a motion to preclude any evidence of specific instances of MV's alleged prior bad conduct or predisposition. The Government specifically sought to exclude any references to allegations that MV engaged in sexual misconduct outside Ms. Sitting Eagle's home at a time when MV was not living with Ms. Sitting Eagle, arguing that such evidence was inadmissible under Federal Rules of Evidence 401, 403, 404(a)(1)–(2), 404(b), 405, and 608. In a hearing on the motion, the Government admitted that Ms. Sitting Eagle could likely introduce "specific acts as a defense to the child abuse charge" showing "that [Ms. Sitting Eagle] was committing reasonable corporal punishment in the time frame between

6

November 1st and December 12th, [2023]" as well as "general opinion" testimony about MV. ROA Vol. III at 523. But it argued that evidence of "specific acts from years in the past" was inadmissible character evidence. *Id.* Ms. Sitting Eagle opposed the Government's motion. She did not identify the specific evidence she wished to admit or specify how it would come in, but she asked the court to "delay any ruling" on the motion and instead assess the admissibility of such evidence as it came up at trial. *Id.* at 524.

The court granted the Government's motion in limine. It reasoned that MV's prior acts, which occurred outside Ms. Sitting Eagle's home and were not near in time to the allegations at issue, did not appear relevant to the case at bar. The court further explained that even if the conduct were relevant, "its probative value would be undoubtedly outweighed by concern of unfair prejudice, confusion of the issues, and . . . misleading the jury." *Id.* at 537. But the court advised that Ms. Sitting Eagle could raise the issue again at trial by presenting an offer of proof and stated that "the [c]ourt may change its ruling, depending on context of the trial and in the interest of justice." *Id.* at 538. Ms. Sitting Eagle did not raise the issue again during trial.

### D.　The Trial

Trial commenced on June 10, 2024, and the evidence closed on June 12, 2024. We detail the relevant evidence presented at trial.

### 1.　MV's Testimony

In its case-in-chief, the Government called MV as a witness. MV testified that his parents kept him home from school following his weeklong suspension in

October 2023. During the day, he worked outside "[m]oving wood or picking weeds." *Id.* at 281. At night, he testified that he was locked in his bedroom and was not allowed to leave. After he tried to escape through the window, Ms. Sitting Eagle and Truman nailed the window shut. MV estimated he was kept in his room for "[a]bout a month." *Id.* at 283. He received food only occasionally and had to urinate in a cup because he was not permitted to use the bathroom. On several occasions, Truman restrained MV in his room by hog-tying him or zip-tying his hands and feet to a post in his closet.

MV testified that both Ms. Sitting Eagle and Truman hit him during this period. The hitting started "[a]fter [Officer] Matt Lee came, after Halloween." *Id.* at 293. The hitting usually occurred in his bedroom and happened "[w]henever [he] did something [he] wasn't supposed to do or [he] messed up on something." MV testified that Ms. Sitting Eagle and Truman used "[t]heir hands, a belt," and a "metal stick and a regular stick" to hit him. *Id.* at 293–94, 301. MV testified that Ms. Sitting Eagle told him to say he was "beat up by the kids over on the street" if anyone asked about his visible injuries. *Id.* at 294.

MV also testified that on one occasion, Ms. Sitting Eagle "kneed [him] in the groin." *Id.* Afterward, he felt "really bad" pain in his testicle that made it difficult to sleep and move his legs. *Id.* at 294–95. His pain continued from the time of his injury until he underwent surgery to have part of his testicle removed.

2.    **Dr. Russell's Testimony**

The Government also called Dr. Maragret Russell as a witness. Dr. Russell, a child abuse pediatrics fellow, served as MV's primary physician at Primary Children's Hospital. She testified that during her medical examination of MV, he told her that "he had been hit with a metal stick and a wooden stick," that "he was struck to his face," and "he was kneed to the groin and hit on his face." *Id.* at 318–19. He identified his mother as the person who kneed him in the groin and hit him in the face but said that both caregivers hit him with sticks.

Dr. Russell also testified that she conducted a physical examination of MV when he was admitted to the hospital. She "found multiple lacerations to his head, bruising to his face, . . . lacerations inside of his mouth, . . . . [b]ruises and abrasions . . . over his arms[,] . . . . some tenderness to his face, and he had curvilinear—curved—scars over his lower extremities, his legs." *Id.* at 319–28. MV also had a ruptured left testicle, a nasal bone fracture, and fractures of his spine. He had lost approximately nine pounds of body weight since his last medical visit on October 11, 2023.

Dr. Russell concluded that there was "no medical diagnosis that would explain [MV's] constellation of symptoms, his scrotal injury, his fractures, and his skin findings," nor was there any medical cause for any of those symptoms in isolation. *Id.* at 329. Dr. Russell therefore determined that MV's injuries "were the result of inflicted trauma or child physical abuse." *Id.* She opined that MV's weight loss was "consistent with what [MV] told [her], that he was deprived food." *Id.* at 332. And

9

she concluded that MV's experience was "consistent with intrafamilial child torture." *Id.* at 329–31.

Dr. Russell also testified that MV had to undergo surgery to treat his ruptured testicle. She explained that it was necessary to remove part of MV's testicle to prevent serious infection.

### 3.    The Defense Witnesses

In her defense, Ms. Sitting Eagle called two witnesses and then testified herself. The first witness was Katherine Vann, Ms. Sitting Eagle's grandmother. Ms. Vann testified that she visited Ms. Sitting Eagle's residence "off and on" from November to mid-December 2023. *Id.* at 356–58. She could not "say dates and times," but she estimated that in November and the first half of December, she visited the residence about "once or twice a week" for fifteen to twenty minutes during the day. *Id.* at 359–60. Ms. Vann testified that during that time, she never saw injuries on MV or noticed any changes in his appearance. She also testified that she saw no signs that MV was locked in his room.

The next witness was Darlynn Seminole, a lifelong friend of Ms. Sitting Eagle. Ms. Seminole testified that she lived with Ms. Sitting Eagle "for about two weeks the beginning of November" 2023. *Id.* at 370–71. She testified that, to her knowledge, MV slept in "a room with the boys" just down the hall from where she slept with two of MV's sisters. *Id.* at 372. During this time, she did not notice any injuries on MV or witness him being locked in a room. *Id.* at 373–74. Ms. Seminole also testified that

she visited the residence twice in the second half of November and once in early December and noticed nothing abnormal about MV during those visits.

Finally, Ms. Sitting Eagle testified. She began her testimony by providing background about her relationship with MV. She explained that she became pregnant with MV out of wedlock, and she married MV's biological father while she was pregnant. After they got married, MV's biological father became abusive toward her. MV was born in 2010. Ms. Sitting Eagle had custody of MV until he was two months old. At that time, Ms. Sitting Eagle lost custody of MV, and he entered foster care.

In 2014, Ms. Sitting Eagle met Truman and had five children with him. Ms. Sitting Eagle and Truman had an "on-and-off relationship" and would break up almost every year. *Id.* at 389. Truman was an alcoholic who was physically abusive toward Ms. Sitting Eagle throughout their relationship.

In 2022, Ms. Sitting Eagle regained custody of MV. MV left his foster placement and came to live with Ms. Sitting Eagle, Truman, and their other children. When he moved in, Ms. Sitting Eagle "did [her] best to establish a relationship with [MV]" by "shower[ing] him with love" and trying to teach him to be a "respectful young man." *Id.* at 391. But she testified that MV had "behavioral issues" and had trouble adjusting to his new living situation. *Id.* at 396–97.

Ms. Sitting Eagle then addressed MV's testimony. She denied locking him in a room, hitting him with either her hands or objects, and kneeing him in the groin. She also testified that she never deprived MV of food. Ms. Sitting Eagle claimed that MV's testimony was false, and that he was "coming up with things to say about

11

[her]" because he did not want to live with her. *Id.* at 400–03. She testified that she was aware of cuts and bruises on MV, but she did not know how he got those wounds until after she was arrested. She also said that she was unaware of the injury to MV's testicle.

Ms. Sitting Eagle also disputed some of Officer Lee's testimony. She testified that when he pulled her over on December 12, she "did not tell [Officer] Lee that [MV] was with Clinton Monroe." *Id.* at 424. Instead, she claimed that she told Officer Lee that "[MV] was at home waiting on a ride from his Uncle Jesse Monroe to go get firewood." *Id.* at 432. She also denied calling Truman to tell him that "[t]he cops [were] coming over to look for him." *Id.* at 432–33.

4.     **Request for Lesser Included Offense Instructions**

Ms. Sitting Eagle requested a jury instruction for the lesser included offense of simple assault on Count Two (assault resulting in serious bodily injury) and Count Four (assault with a dangerous weapon), but the district court denied the request. It did not explain its reasoning. But prior to denying the request the district court commented that it was "not sure there is a lesser included offense" for Counts Two and Four.

### E.     *Verdict and Conviction*

The jury found Ms. Sitting Eagle guilty on Counts Two, Four, and Six. On September 24, 2024, the district court sentenced Ms. Sitting Eagle to 121 months of imprisonment followed by five years of supervised release. Ms. Sitting Eagle timely appealed.

12

## II.    DISCUSSION

First, Ms. Sitting Eagle argues that the district court abused its discretion by denying her request for a jury instruction on the lesser included offense of simple assault for the charged offenses of assault resulting in serious bodily injury and assault with a dangerous weapon. Next, she argues that the cumulative effect of several alleged errors during her trial warrant reversal of her conviction on constitutional grounds. We consider each of these issues in turn.

### A.    *Lesser Included Offense Instruction*

Prior to the case being submitted to the jury, Ms. Sitting Eagle asked the district court to instruct the jury on the lesser offense of simple assault in addition to the instructions for assault resulting in serious bodily injury and assault with a dangerous weapon. The district court declined to include the instruction. She now argues that the court abused its discretion by denying her request.

### 1.    Legal Background

We review "the district court's decision as to whether there is enough evidence to justify a lesser included offense instruction . . . for an abuse of discretion.". *United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000) (internal quotation marks omitted), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). "An abuse of discretion occurs when the district court renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *United States v. Joseph*, 108 F.4th 1273, 1281 (10th Cir. 2024) (internal quotation marks omitted). Under this deferential standard, we reverse the district court only when we have a "definite and

13

firm conviction that the [district] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotation marks omitted).

District courts do not have "broad ranging discretion" when deciding whether to instruct the jury on a lesser included offense. *Humphrey*, 208 F.3d at 1206. Federal Rule of Criminal Procedure 31(c)(1) provides that "[a] defendant may be found guilty of . . . an offense necessarily included in the offense charged." Under this rule, "[i]t is well-established that a defendant 'is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" *United States v. Pacheco*, 884 F.3d 1031, 1047 (10th Cir. 2018) (quoting *Beck v. Alabama*, 447 U.S. 625, 635 (1980)). Thus, "if there is evidence to support a lesser included offense and defendant requests such a charge, the court has no discretion to refuse to give the instruction." *Id.* (quotation marks omitted).

A defendant is entitled to a lesser included offense instruction if:

(1) he properly requested the instruction, (2) the elements of the lesser offense are included in the elements of the greater offense, (3) the element[s] differentiating the two offenses [are] in dispute, and (4) the jury is able to rationally acquit the defendant of the greater offense and convict on the lesser offense.

*United States v. Oldman*, 979 F.3d 1234, 1243 (10th Cir. 2020) (internal quotation marks omitted). "If each of these four elements can be satisfied, the district court must provide the instruction." *United States v. Abeyta*, 27 F.3d 470, 473 (10th Cir. 1994).

14

2.　　**Analysis**

Here, the parties do not dispute that Ms. Sitting Eagle has satisfied the first two elements of this test. Ms. Sitting Eagle properly requested instructions for the lesser included offense of simple assault for Count Two, assault resulting in serious bodily injury, and Count Four, assault with a dangerous weapon. And this court has acknowledged that the elements of simple assault are included in the elements of both assault resulting in serious bodily injury and assault with a dangerous weapon. *See United States v. Bruce*, 458 F.3d 1157, 1164 n.4 (10th Cir. 2006); *see also United States v. Poole*, 545 F.3d 916, 919 (10th Cir. 2008). The dispute, therefore, centers solely on the third and fourth elements of the test.

Ms. Sitting Eagle asserts that the elements differentiating the charged offenses from simple assault were in dispute at trial because she "denied that she caused serious bodily injury" to MV "or that she ever used a deadly weapon" on him. Appellant's Br. at 11. The Government responds that Ms. Sitting Eagle's blanket denial of all involvement in the assaults was not sufficient to bring the differentiating elements into dispute.

We agree with the Government that the third element is not satisfied here. The Government's theory underlying the charge of assault resulting in serious bodily injury was that Ms. Sitting Eagle kneed MV in the groin "so hard . . . that it ruptured his testicle." ROA Vol. III at 467. And the Government's theory underlying the charge of assault with a dangerous weapon was that Ms. Sitting Eagle hit MV with blunt objects, including a "metal sticks" and "rods." *Id.* at 469–70. But Ms. Sitting

15

Eagle did not rely on the absence of serious bodily injury or the use of a dangerous weapon in her defense. The jury was presented with no evidence that brought into question whether MV suffered serious bodily injury as a result of the knee to his groin, whether the objects used against MV were dangerous weapons, or whether those objects were used against him with an intent to commit bodily harm. Instead, Ms. Sitting Eagle's defense was that she did not assault MV at all and that Truman was the one who was responsible for assaulting MV. Because the evidence at trial "only allowed the jury to decide that [Ms. Sitting Eagle] either did or did not participate in" the assault that caused MV's ruptured testicle or the assaults with various blunt objects, an instruction on simple assault was not warranted. *See United States v. Espinoza*, 277 F. App'x 789, 792 (10th Cir. 2008) (unpublished).[4]

Further, regardless of whether the third element has been met, Ms. Sitting Eagle's claim of error is fatally defective with respect to the fourth requirement—that the jury could rationally convict her of the lesser offense and acquit her of the greater. In determining whether this element is met, the district court "must give full credence to defendant's testimony." *United States v. Brown*, 287 F.3d 965, 974 (10th Cir. 2002). A defendant "is entitled to the instruction even if the evidence supporting it is weak and depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and prosecution witnesses on the other

---

[4] We cite unpublished cases for their persuasive value only and do not treat them as binding authority. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

points in dispute." *Id.* And "the court must take into account the possibility that the jury might . . . make findings different from the version set forth in anyone's testimony." *United States v. Yazzie*, 188 F.3d 1178, 1185 (10th Cir. 1999) (alterations in original) (quotation marks omitted). But "[a] district court commits reversible error in denying a lesser-included offense instruction only if we are convinced a rational jury could convict on the lesser charge and acquit on the greater charge." *Oldman*, 979 F.3d at 1244. (internal quotation marks and brackets omitted).

If we give full credence to Ms. Sitting Eagle's testimony, a jury could not rationally convict her on simple assault because her testimony is completely exculpatory. To be sure, "[w]e have previously said that a defendant is entitled to instructions on any defense, including inconsistent ones, that find support in the evidence and the law." *Pacheco*, 884 F.3d at 1048 (internal quotation marks and brackets omitted). Thus, on its own, Ms. Sitting Eagle's decision at trial to deny all involvement in the assaults and abuse of MV "d[id] not itself automatically preclude [her] from seeking a lesser included offense instruction" on Counts Two and Four, although it was "a powerful piece of evidence tending to negate any evidentiary support for such an instruction." *See id.* at 1047–48. Instead, we still must ask whether, based on all the evidence submitted to the jury, there was "evidentiary support for such an instruction." *See id.*

Ms. Sitting Eagle argues that, even though she denied ever assaulting MV, a jury could rationally acquit her of the greater offenses and convict her of only simple assault because part of MV's testimony included an allegation that Ms. Sitting Eagle

17

and Truman hit him with their "hands." ROA Vol. III at 293. We disagree. Under Ms. Sitting Eagle's theory, the jury would need to credit MV's singular statement that Ms. Sitting Eagle and Truman used "[t]heir hands" to hit him on some occasions, *see id.*, but reject MV's specific testimony that Ms. Sitting Eagle hit him with metal rods and kneed him in the groin, as well as Dr. Russell's testimony corroborating MV's story. The jury would also need to credit Ms. Sitting Eagle's testimony that she never hit MV with objects or kneed him in the groin but reject her testimony that she never hit him with her hands.

The jury had no rational basis to make this distinction. It heard no evidence contradicting MV's testimony about the specific instances of assault, including that Ms. Sitting Eagle hit him on some occasions with her hands and on others with sticks and metal rods. Instead, Ms. Sitting Eagle attempted to impeach MV's general credibility and invited the jury to discredit all of MV's testimony, claiming she never hit or kneed MV at all. A jury, examining all the evidence, would have no rational reason to disregard most of the evidence in this case and believe only MV's statement that Ms. Sitting Eagle hit him with her hands on some occasions.

Moreover, even if we assume that the jury could rationally make this finding, MV's statement would not support a conviction for simple assault. We have defined simple assault in the context of 18 U.S.C. § 113 as a "willful attempt to inflict injury upon the person of another, or a threat to inflict injury upon the person of another," which "does not involve actual physical contact, a deadly or dangerous weapon,

18

bodily injury, or the intent to commit" certain felonies. *United States v. Wolfname*, 835 F.3d 1214, 1218 (10th Cir. 2016) (quotation marks omitted).

MV's allegation that Ms. Sitting Eagle hit him with her hands on unspecified occasions involves actual physical contact, which brings the conduct outside the scope of simple assault. *See id.* And assault involving physical contact is not a lesser included offense of assault resulting in serious bodily injury or assault with a dangerous weapon. *See Bruce*, 458 F.3d at 1162 n.1 (explaining that physical contact is not a required element for assault resulting in serious bodily injury or assault with a dangerous weapon); *Schmuck v. United States*, 489 U.S. 705, 716 (1989) (adopting the elements approach to lesser offenses and holding that an offense is a lesser-included offense of the charged offense if "the elements of the lesser offense are a subset of the elements of the charged offense;" that is, "[w]here the lesser offense requires an element not required for the greater offense, no [lesser-included-offense] instruction is to be given"). Thus, even if the jury were to credit only MV's testimony that Ms. Sitting Eagle hit him with her hands, there would be no rational basis for the jury to convict Ms. Sitting Eagle of simple assault.

"We may only reverse the district court's denial of this instruction if we are convinced a rational jury could convict on the lesser charge and acquit on the greater charge." *Pacheco*, 884 F.3d at 1048 (internal quotation marks omitted). After reviewing the record in this case, we are not convinced that a jury could have rationally concluded that Ms. Sitting Eagle committed simple assault against MV but not the greater charges. We therefore conclude that the district court's refusal to

19

instruct the jury on the lesser included offense was not "arbitrary, capricious, whimsical, or manifestly unreasonable." *See Joseph*, 108 F.4th at 1281.

In sum, Ms. Sitting Eagle has not shown that the elements differentiating simple assault from the greater offenses were in dispute at trial, nor has she shown that the jury was able to rationally acquit her of the greater offenses and convict her on the lesser offense. Accordingly, we conclude that the district court's denial of Ms. Sitting Eagle's request for an instruction on simple assault for Counts Two and Four was not an abuse of discretion.

### B.    *Cumulative Errors*

Next, Ms. Sitting Eagle argues that her convictions should be reversed because of the cumulative effect of alleged errors made during her trial. The alleged errors fall into three categories: (1) the district court's decision granting the Government's motion in limine to exclude evidence of MV's prior bad acts; (2) the district court's decisions to sustain several of the Government's objections to the direct examination of Ms. Sitting Eagle; and (3) the Government's improper questioning of Ms. Sitting Eagle and Ms. Seminole. We examine each alleged error in turn and then determine whether the cumulative effect of the errors warrants reversal of Ms. Sitting Eagle's convictions.

### 1.    Motion in Limine

Ms. Sitting Eagle argues that the district court erred in granting the Government's motion in limine to exclude evidence of MV's prior bad acts. She asserts that she preserved the claimed error and that the district court's decision is

20

therefore reviewable for abuse of discretion. The Government counters that

Ms. Sitting Eagle did not present an adequate offer of proof to the district court, and

thus asserts the court's decision is only reviewable for plain error.

A party may not claim error based on a ruling excluding evidence unless the

"party informs the court of its substance by an offer of proof," or "the substance was

apparent from the context." *See* Fed. R. Evid. 103(a)(2). "[M]erely telling the court

the content of proposed testimony is not an offer of proof. In order to qualify as an

adequate offer of proof, the proponent must, first, describe the evidence and what it

tends to show and, second, identify the grounds for admitting the evidence." *United

States v. Adams*, 271 F.3d 1236, 1241 (10th Cir. 2001) (internal quotation marks

omitted). These required showings serve the "twofold purpose" of "enabl[ing] the

trial judge to make informed decisions based on the substance of the evidence" and

"creat[ing] a clear record that an appellate court can review to determine whether

there was reversible error in excluding the [evidence]." *Id.* (internal quotation marks

omitted). If the proponent fails to provide an adequate offer of proof, "then this court

can reverse only in instances of plain error that affected appellant's substantial

rights." *Id.*

Ms. Sitting Eagle's statements at the hearing on the motion in limine fell short

of qualifying as a proffer. She offered only general assertions that MV's past conduct

might be relevant to parts of her defense. Namely, she explained that she planned to

introduce some of MV's "history" as "background" to Ms. Sitting Eagle's

relationship with MV and how she raised him. ROA Vol. III at 524. She also argued

21

that she intended to "ask [MV] certain things about . . . the conduct that he did and what happened to him," and she argued that his history raises "very serious considerations about his truthfulness." *Id.* at 525. Finally, she alleged that "there's information that [MV] was sexually abusive towards other siblings that he had in his foster home," and she explained that this history was relevant to her defense that Ms. Sitting Eagle "was trying to protect her other children" and "acting as best she could" toward MV. *Id.* at 528.

But Ms. Sitting Eagle's statements during the hearing are too vague to qualify as an adequate offer of proof. She did not identify the specific facts she intended to introduce, the source of that information, or the grounds on which she believed the evidence was admissible. Indeed, she did not even argue that MV's prior acts were admissible; she asked the court only to "delay any ruling" on the motion and instead assess the admissibility of such evidence as it came out at trial. *Id.* at 524–25. And even though the district court specifically advised that it "may change its ruling, depending on context of the trial and in the interest of justice," *id.* at 538, Ms. Sitting Eagle declined to raise the issue again at trial.

Because Ms. Sitting Eagle did not make an offer of proof adequate to preserve the claimed error, the district court's decision granting the Government's motion in limine is reviewable for plain error. But Ms. Sitting Eagle did not make a plain-error argument in her opening brief. She also failed to make a plain-error argument in her reply brief, despite being on notice of the Government's preservation argument. "When an appellant fails to preserve an issue and also fails to make a plain-error

argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *United States v. McBride*, 94 F.4th 1036, 1044 (10th Cir. 2024) (quotation marks omitted); *see also Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court."). Because Ms. Sitting Eagle failed to preserve her argument before the district court and failed to argue plain error before this court, we treat her argument as waived.

## 2.    Evidentiary Decisions at Trial

Ms. Sitting Eagle next argues that the district court erred by sustaining several of the Government's objections to Ms. Sitting Eagle's testimony. But her challenge to these decisions fails because she has not adequately briefed her argument.

An appellant's opening brief must contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies; and . . . for each issue, a concise statement of the applicable standard of review." Fed. R. App. P. 28(a)(8). Consistent with this rule, we have routinely held that "a litigant may waive appellate review of an issue by not arguing it—or arguing it in an inadequate manner—in [her] opening brief." *United States v. Woodmore*, 135 F.4th 861, 877 (10th Cir. 2025) (internal quotation marks omitted). We "will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, in the opening brief."

*United States v. Clay*, 148 F.4th 1181, 1201 (10th Cir. 2025) (internal quotation marks omitted).

Ms. Sitting Eagle's opening brief does not adequately raise and develop an argument as to the propriety of the district court's evidentiary decisions during trial. In her opening brief, Ms. Sitting Eagle challenges the court's rulings on the Government's objections to certain "types of questions." Appellant's Br. at 19. But she does not indicate where in the record these alleged errors can be found, nor does she clarify whether any of the alleged errors are preserved and what standard of review applies, as required by Federal Rule of Appellate Procedure 28(a)(8). Indeed, Ms. Sitting Eagle cites to the record for only one alleged error.

And even if we were to comb through the record and identify the evidentiary decisions Ms. Sitting Eagle challenges on appeal, Ms. Sitting Eagle has not developed her argument enough to preserve the issue for appellate review. She fails to provide a meaningful analysis for any of the alleged errors, stating only that "the evidence was plainly not being introduced for the truth of the matter asserted and, thus, was not hearsay." Appellant's Br. at 19. She does not explain *why* the evidence was being introduced, and she does not cite to any authority on this point. Ms. Sitting Eagle's "cursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine." *See Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007). We therefore treat this issue as waived.

24

### 3.    Improper Questioning

Ms. Sitting Eagle next argues that the Government committed reversible prosecutorial misconduct by asking improper questions to Ms. Sitting Eagle and Ms. Seminole during trial. Ms. Sitting Eagle's challenges to the Government's questions similarly fail due to inadequate briefing.

#### a.    Legal background

"A prosecutor may commit misconduct by eliciting improper and prejudicial witness testimony." *United States v. Kepler*, 74 F.4th 1292, 1315 (10th Cir. 2023). "[A] prosecutor's misconduct may in some instances render a . . . trial so fundamentally unfair as to deny a defendant due process." *United States v. Christy*, 916 F.3d 814, 824 (10th Cir. 2019) (internal quotation marks omitted). "When a defendant seeks appellate relief for improper prosecutor comments made at trial, the standard of review that we apply . . . depends on whether the defendant objected at trial and how the court responded." *Id.* at 826. We have identified the standard of review for four situations:

> (1) The defendant objects and the court overrules the objection—de novo review.
>
> (2) The defendant objects, the district court takes curative action, and the defendant objects to the adequacy of the curative action or asks for a mistrial—abuse of discretion review.
>
> (3) The defendant objects, the district court sustains the objection, and the defendant fails to object to the adequacy of the curative action—plain error review.
>
> (4) The defendant does not object at trial but raises the issue on appeal—plain error review.

25

*Id.*

Here, because Ms. Sitting Eagle did not object to the allegedly improper questions asked to her on cross-examination or the adequacy of the curative action taken in response to the Government's allegedly improper question to Ms. Seminole, plain-error review applies to both challenges.

b.    *Were-they-lying questions*

Ms. Sitting Eagle first argues that the Government committed reversible prosecutorial misconduct by asking two questions to Ms. Sitting Eagle on cross-examination about whether she thought a law enforcement officer was lying. The Government asked the first question after Ms. Sitting Eagle testified that she did not tell Officer Lee that MV was with someone named Clinton Monroe, which conflicted with Officer Lee's testimony. The Government had the following exchange with Ms. Sitting Eagle:

> A. . . . I did not tell Matt Lee that he was with Clinton Monroe.
>
> Q. Do you think Matt Lee's lying?
>
> A. Yes.
>
> Q. You're the one on trial here. Do you realize that?
>
> A. Yes, sir.

ROA Vol. III at 424. Shortly after that, the Government asked:

> Q. Ms. Sitting Eagle, you got on your phone and told [Truman] "The cops are coming over to look for him"?
>
> A. No.
>
> Q. You're claiming you didn't say that?

26

A. No, sir.

Q. So once again, you think Officer Lee is lying?

A. I don't think he actually heard what I said.

Q. He testified here that you said that.

A. Yes, sir.

*Id.* at 432–33.

Ms. Sitting Eagle did not object to the Government's "were-they-lying" questions at trial, but she argues on appeal that they were improper. Accordingly, plain-error review applies. *Christy*, 916 F.3d at 826.

Despite acknowledging that her challenge is reviewable for plain error, Ms. Sitting Eagle does not "attempt[] to run the gauntlet created by our rigorous plain-error standard of review." *See United States v. Isabella*, 918 F.3d 816, 845 (10th Cir. 2019) (internal quotation marks omitted). She does not state the plain-error standard or its elements, nor does she purport to apply the plain-error standard to her challenge. Indeed, she mentions plain error only a single time in the section of her brief dedicated to this argument, where she baldly asserts that the Government's questions constituted "reversible plain error." Appellant's Br. at 26. "[A]sserting that one-fourth (if that) of the plain error standard has been met is too general and conclusory to warrant review, and certainly does not allow the adversarial process to be served." *McBride*, 94 F.4th at 1046 (internal quotation marks omitted).

Because Ms. Sitting Eagle inadequately argued for plain error before this court, "her arguments have come to the end of the road and are effectively waived." *See id.* at 1045; *see also United States v. MacKay*, 715 F.3d 807, 831 n.17 (10th

27

Cir. 2013) ("[A]n appellant carries the heavy burden of satisfying plain error. And if an appellant fails to satisfy that burden, we do not develop a plain error argument for the appellant." (citation omitted)). We therefore decline to consider Ms. Sitting Eagle's argument that the Government plainly erred by asking were-they-lying questions.

### c.    FBI investigation question

Next, Ms. Sitting Eagle argues that the Government committed reversible prosecutorial misconduct by asking the defense witness Ms. Seminole about whether there was an FBI investigation related to her children. Specifically, the Government had the following exchange with Ms. Seminole:

> [GOVERNMENT]: Ms. Seminole, you're aware that there is an investigation by the FBI into whether your own children were victims of—
>
> [DEFENSE COUNSEL]: Objection, Your Honor; relevance.
>
> [GOVERNMENT]: Your Honor, it goes to bias. And I can explain in—in camera if you wish.
>
> A. That's –
>
> THE COURT: Why don't you approach–
>
> A. (Continuing.)—see, I haven't been harassing my kids—
>
> THE COURT: Approach here.

ROA Vol. III at 382. After a sidebar conference, the court sustained Ms. Sitting Eagle's objection, and the Government asked no further questions about the investigation. Ms. Sitting Eagle did not request any corrective actions. On appeal, Ms. Sitting Eagle argues that "it is not at all clear from the record that the jury would have heard the court's ruling" and that "simply by asking the question, the

28

government injected irrelevant and prejudicial information before the jury that reflected negatively on the witness." Appellant's Br. at 28.

Because the district court sustained Ms. Sitting Eagle's objection to the allegedly improper question and Ms. Sitting Eagle did not object to the adequacy of the curative action taken by the court, plain-error review applies. *See Christy*, 916 F.3d at 826. But again, Ms. Sitting Eagle's briefing proves inadequate. She does not identify the applicable standard of review for this issue at all, much less attempt to meet the heavy burden required under our plain-error standard. We therefore treat this argument as waived. *Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court.").

## 4.    Cumulative Error

Finally, we address Ms. Sitting Eagle's assertion that the cumulative effect of the errors she identifies warrants the reversal of her conviction. "We consider cumulative error only if the appellant has shown at least two errors that were harmless." *Christy*, 916 F.3d at 827. "Anything less would leave nothing to cumulate." *Id.* Here, as explained above, Ms. Sitting Eagle has waived her arguments that any errors occurred. We therefore decline to apply cumulative error analysis, and we affirm Ms. Sitting Eagle's convictions.

## III.   CONCLUSION

Based on the forgoing analysis, we AFFIRM in full the district court.[5]

Entered for the Court

Carolyn B. McHugh
Circuit Judge

---

[5] Ms. Sitting Eagle filed a motion for leave to proceed in forma pauperis ("IFP"). Because Ms. Sitting Eagle was eligible for appointed counsel under 18 U.S.C. § 3006A, she was permitted to file an appeal of her convictions "without prepayment of fees and costs or security therefor and without filing the affidavit required by section 1915(a) of title 28." 18 U.S.C. § 3006A(d)(7). We therefore dismiss her IFP motion as moot.